UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                                                        CASE NO.

**GEORGE H. MASSEY**                                                            **06-11338**
**SHARRON BEACH MASSEY**

DEBTOR                                                                                    SECTION A
                                                                                                    CHAPTER 7

## REASONS FOR DECISION

This matter came before the Court on the Third and Final Application for Allowance of Fees and Costs[1] filed by Gordon, Arata, McCollam, Duplantis & Eagan, LLC ("Mover"),[2] attorneys for R. Patrick Sharp III, Chapter 7 Trustee ("Trustee"). Mover seeks to recover $116,161.25 in fees and $3,314.46 in costs.

Prior applications have already awarded Mover $270,075.50 in fees and $3,119.34 in costs.[3]

The Fifth Circuit uses the "lodestar" method to calculate attorneys' fees. *Shipes v. Trinity Industries*, 987 F.2d 311, 319-20 (5th Cir.), cert. denied, 510 U.S. 991, 114 S.Ct. 548, 126 L.Ed.2d 450 (1993). The lodestar is computed by multiplying the number of hours reasonably expended by the prevailing hourly rate in the community for similar work. Id. The court then adjusts the lodestar upward or downward depending upon the respective weights of the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc*., 488 F.2d 714, 717-19 (5th Cir.1974).[4]

---

[1] P-787.

[2] "Mover" shall also include the individual attorneys performing services for which the firm seeks compensation.

[3] P-529 and 771. These fees are subject to review and final approval now that the case is complete. "Interim fee awards are not final determinations intended to put a matter at rest. Rather, they are interlocutory and reviewable, and are intended only to provide some interim relief from the economic hardships of subsidizing litigation." *Matter of Evangeline Refining Co.,* 890 F.2d 1312, 1322 (5th Cir. 1989); *See also, In re Taxman Clothing Co., Inc*., 134 B.R. 286, 291 (N.D.Ill. 1991); *In re East Hill Mfg. Corp.*, 2001 WL 348o8428, *7 (Bankr.D.Vt. 2001); In re Regan, 135 B.R. 216, 218 (Bankr.E.D.N.Y. 1992).

[4] *Matter of Fender*, 12 F.3d 480, 487 (5th Cir. 1994).

The twelve (12) Johnson factors are: (1) time and labor required, (2) novelty and difficulty of the issues, (3) skill required to perform the legal services properly, (4) preclusion of other employment, (5) customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by client or circumstances, (8) amount involved and results obtained, (9) experience, reputation and ability of the attorneys, (10) undesirability of the case, (11) nature and length of the professional relationship with the client, and (12) award in similar cases.[5]

Before addressing the Johnson factors, a brief summary of the case is in order. The debtors, George and Sharron Massey ("Masseys"), filed a joint case under chapter 11 of the Bankruptcy Code on November 29, 2006. At the time of filing, Mr. Massey owned a mail order pharmacy business, Med Link America, Inc. ("Med Link"), which operated out of Mississippi. As a result of Hurricane Katrina, Med Link's business suffered. The Masseys' stated intention for filing chapter 11 was to reorganize both themselves and their company. The Masseys' sole source of income came from Med Link. Against this income they had over $2,700,000.00 in secured and $1,113,550.00 in unsecured debts.[6]

During several hearings, the Masseys were directed to reduce their lifestyle in order to provide a good faith payment to creditors. However, the Masseys continued to spend money postpetition well beyond their means and to incur debt without court authorization. For example, when the Masseys originally filed for relief, they owned a home with an estimated market value of $3,100,000.00 encumbered by a mortgage with a balance of $2,584,076.00 and monthly payments

---

[5] *Johnson*, 488 at 717-719.

[6] P-23.

of $18,950.00.[7] When their lender requested relief from the automatic stay in order to foreclose, the motion was granted.[8] The Masseys purchased a $1,650,000.00 home in the French Quarter through owner financing was not approved by the Court. When the Court reversed the transaction and ordered the property returned to the owner,[9] the Masseys moved into the Windsor Court Hotel incurring costs of $320.00 per night because it was the only hotel that would take their cats.[10]

Early in the case, L. Mack Laney, a vendor who sold the Masseys hundreds of thousands of antique furniture and collectibles, also complained that the Masseys had failed to account for the whereabouts of the property they purchased from him, but to date had not paid for.[11]

The Masseys failed to report income and expenses generated from Med Link. Records of business transactions were not maintained and state requirements for operation were not honored. As a result of these issues and many more, the Court appointed Trustee as chapter 11 trustee.

The first task assigned to Trustee was to determine if Med Link could be reorganized. The Masseys listed few assets that were not encumbered beyond their value. Therefore, it was originally assumed that a reorganization of Med Link presented the best chance for a distribution to unsecured

---

[7] *Id.*

[8] P-78.

[9] P-360.

[10] P-392, Transcript 4/29/08, pp. 66 and 70.

[11] P-150, Motion for Relief from Automatic Stay and to Disclose Location of Property.

3

or undersecured claimants. However, shortly after Trustee was appointed, Med Link filed for relief as well,[12] and Med Link's counsel was charged with salvaging its business operations.

Med Link's bankruptcy filing allowed Trustee to focus on the Masseys' pre and postpetition conduct. On August 29, 2008, the Masseys case was converted to a chapter 7 liquidation,[13] and Trustee was appointed as chapter 7 trustee. Trustee turned his attention to allegations of hidden assets and prohibited postpetition transfers by the Masseys. Trustee's efforts have generated a recovery of $424,917.50 and waiver of the Masseys' discharge. As counsel for Trustee, Mover seeks a total of $386,236.75 in fees and $6,433.80 in costs.

## Time and Labor Required

"The [] judge should weigh the hours claimed against his own knowledge, experience, and expertise of the time required to complete similar activities."[14] To date Mover has been awarded fees in the amount of $270,075.50[15] and is requesting an additional $116,161.25,[16] for a total of $386,236.75. Mover has separated his fee request into seven (7) broad categories:

(1) avoidance related matters;
(2) matters attributable to the enforcement of [the Masseys'] obligations and compliance;
(3) objection to [the Masseys'] discharge;
(4) sustainability of Med Link [(the Masseys' company)];

---

[12] Case no. 08-11235, filed on June 2, 2008.

[13] P-428.

[14] *Id.* at 717.

[15] P-529 and 771.

[16] P-787.

4

(5) general administration of the estate;
(6) sale of assets; and
(7) legal assistant [charges].[17]

Including the amounts currently at issue, Mover has requested a total of $172,237.15 for the recovery of assets and their liquidation. These efforts have netted $161,000.00 in cash, several pieces of art, and assets later sold for $258,917.50.

Mover has also requested a total of $43,782.50 for matters related to the objection to the Masseys' discharge. Ultimately, the Masseys waived their discharge as a result of these actions.

Mover has requested $3,962.50 in fees associated with his review of Med Link and $2,170.89 for the services of a legal assistant. Mover also incurred $41,950.00 in fees associated with the general administration of the estate.

Finally, Mover has requested an additional $118,994.50 in fees generated for "enforcement of [the Masseys'] obligations and compliance." Given the substantial fees awarded for case administration; objecting to the Masseys' discharge; and recovery and liquidation of estate assets, additional fees for "enforcement of [the Masseys'] obligations and compliance" is excessive.

Admittedly, the Masseys were recalcitrant and less than honest regarding the location or existence of estate assets and avoidable transfers. However, Mover was also inefficient and disorganized in its analysis and prosecution of the search for the truth. Mover began his investigation of the Masseys' activities by demanding the production of bank statements and other financial records.

---

[17] Binder 1/2, "Massey Fee Breakdown."

5

Predictably, the Masseys failed to cooperate, alleging that they possessed only a few bank statements and no records. Mover's next step was to compel production,[18] citing the Masseys' refusal to deliver financial records and refusal to cooperate with Trustee.[19] Nevertheless, when the Motion to Compel came up for hearing, it was continued several times at Trustee's request on the representation that the Masseys' were cooperating. Ultimately, the Masseys never produced the requested bank records.

Because Trustee did not obtain the bank records, a Motion for Contempt was filed on April 25, 2008, and set for hearing on an emergency basis on May 5, 2008.[20] However, when the case was called, Mover requested that hearing be continued to May 28, 2008.[21] Trustee then filed a Motion to Convert[22] the case from chapter 11 to chapter 7. However, on May 22, 2008, Mover filed a Motion to Continue[23] both hearings because he was going out of town for the week of May 28, 2008, even though he has requested emergency relief, had agreed to the hearing date, and had known about it for two (2) weeks. A second continuance was granted to the date requested by Mover, June 3, 2008, a regular Motion Day.[24] However, at the June 3, 2008, hearing, the matter had to be continued a third time because Mover wanted to present evidence and testimony. Mover is an

---

[18] P-346.

[19] *Id*. at p. 4.

[20] P-370.

[21] P-375.

[22] P-377.

[23] P-387.

[24] P-389.

6

experienced attorney in this district and was well aware that evidence and testimony are not taken on Motion Days but only at a special hearing date. After asking for a third continuance, Mover was to contact chambers to schedule the special setting.[25] Mover did not. Finally, on July 2, 2008, Mover requested a status conference on the Motion for Contempt,[26] which was held on July 28, 2008. At the status conference Mover represented that he and the Masseys' counsel had settled their differences and again he continued the Motion for Contempt.

On October 2, 2008, Mover added to his burgeoning list of pending motions, a motion to turnover the bank statements that were the subject of the May 5, 2008, hearing motion to compel.[27] In the motion, Mover admitted that the Masseys did not have possession of the records he requested, but alleged that, "the burden and expense falls on [the Masseys] to incur the expense of obtaining them from third parties and delivering them to [Trustee]." As Mover is well aware, the Federal Rules do not require the production of documents that do not exist. Unfortunately this may make a trustee's job more difficult, but a party can not be made to produce what does not exist.[28] Instead, the Court ordered the Masseys to give Mover their electronic password to access the bank accounts.

---

[25] The June 3, 2008, Memo to Record does not have a pleading number; it is between pleading numbers 399 and 400.

[26] P-410.

[27] P-447.

[28] Potentially, there are negative consequences that flow from a debtor's failure to keep adequate books and records including a denial of discharge. *See* 11 U.S.C. § 727(a)(3).

On October 15, 2008, Mover filed a Motion in Furtherance of the Turnover Order,[29] stating that the records could not be accessed electronically because the accounts were closed. Again, Mover argued that the Masseys be forced to acquire paper copies. At the October 23, 2008, hearing, it was revealed that $1,500.00 would cover the costs of production from the bank. Ultimately, Mover paid that expense but only after he spent countless hours, filed several motions, and attended several hearings or pretrial conferences on the matter. A lawyer must consider the amount in dispute and discount that by the likelihood of success in order to properly evaluate the worth of litigation. He then owes a professional duty to the client to recommend that no action be commenced if the cost of the battle exceeds the value of the litigation.[30]

The failure of Mover to recognize that the Masseys' lack of cooperation was a stalling tactic caused unnecessary expense. Mover should have balanced the hours he was generating through litigation against the meager $1,500.00 in costs necessary to obtain the information he sought. If he had, the appropriate method for handling this case would have been clear.

Even when Mover obtained the relief he requested, he neglected to submit proposed orders to the Court and did not respond to Notices of Deficiency[31] sent by the Clerk's Office. Finally, after

---

[29] P-464.

[30] *In re Arnold*, 162 B.R. 775, 779 (Bankr.E.D. Mich. 1993); *In re Great Sweats, Inc*. 113 B.R. 240, 242 (Bankr.E.D.Va. 1990); *In re Puget Sound Plywood, Inc.*, 924 F.2d 955, 959 (9th Cir. 1991).

[31] P-636.

the Court issued an Order to Show Cause,[32] the proposed order was submitted and an Order was finally entered on May 26, 2009,[33] over a year after Mover first sought the records.

On October 8, 2008, Mover was again before the Court complaining that the Masseys' had failed to itemize their personal possessions. There were allegations that the Masseyss' might have hidden or disposed of significant personal property including jewelry, antique furniture, paintings, Persian rugs and other valuable collectibles. For months the Masseys' had stymied both Trustee and creditors by professing selective amnesia. In order to bring the matter to a head, the Court ordered Trustee, Mover, the Masseys and their counsel to immediately recess to the Masseys' home and take an inventory of all its contents. The Court also instructed Trustee to take possession of all items not otherwise exempt and move them to a secure location under security guard if necessary.[34] Instead, Trustee walked the property, took pictures, and left thousands of dollars worth of jewelry and other items in the Masseys' possession.

Five (5) months later, on March 19, 2008, Mover requested a status conference regarding turnover of the Masseys' property. The Court again instructed Mover to execute the Court's Order dated October 8, 2008, to remove all property from the Masseys' house which Trustee believed was not exempt.[35] Instead, Mover filed another Motion for Turnover on March 30, 2009, five (5) months later, stating that Mover had "attempted to amicably coordinate the turnover," but the Masseys were

---

[32] P-652.

[33] P-657.

[34] P-457.

[35] P-588.

9

not cooperative; Mover requested accompaniment of U. S. Marshal. The Court had already ordered Mover to take possession of the property and post a security guard if necessary. An additional motion and delay was wasteful. At the hearing, Mover represented that an agreement had been reached.[36]

The hearings and continuances detailed above were only the first step in this saga. These efforts only located items still in the Masseys' possession. They did not locate or trace the items worth hundreds of thousands of dollars that were sold by the Masseys during their bankruptcy case for undisclosed cash payments. Nor did they reveal assets hidden by the Masseyss in storage facilities, their son's home, or with friends. The work to locate these items did not begin in earnest until January 20, 2009, when, under *sua sponte* threat of incarceration by the Court, the Masseys finally and completely disclosed the nature and extent of assets and details of avoidable transactions.[37]

Even after assets were located, the Masseys' propensity for disruption continued. Shortly after Trustee moved to sell the Masseys' property, the Masseys claimed the items as exempt. At the first hearing on Trustee's Objection to Exemptions,[38] Mover requested a continuance to work out an agreement with the Masseys.[39] The Court continued the matter to January 13, 2009, at which

---

[36] P-608.

[37] P-547.

[38] P-487.

[39] P-521.

time Mover again requested a continuance to March 24, 2009.[40] Mover did not proceed with prosecution of his Objection and the matter was not resolved.

Several months later, on August 21, 2009, Mover filed another Objection to Exemptions and set it for hearing on September 22, 2009, a regular Motion Day. At the hearing on September 22, 2009, Mover requested that the matter be continued to a special setting, which the Court scheduled for September 30, 2009. Mover should have set the matter on a special setting day initially, rather than wasting time and money. Mover requested that the hearing be cancelled and a status conference be held instead. On October 5, 2009, the Court held a status conference at which time Mover represented that Trustee and the Masseys were working toward an agreement, which was finally filed as a Motion to Compromise on October 22, 2009.

The Court finds that Mover spent an inordinate amount of time, amounting to a fee charge of $118,994.00, on what it describes as "enforcement of debtor obligations and compliance." This is in excess of the total amount of fees requested by Mover in connection with Trustee's Objection to the Masseys' discharge ($43,782.50) and with general administration of the estate ($41,950.00). In the Court's experience, these fees are excessive because Mover did not conduct its investigation or prosecution of its duties in an efficient and effective manner.

### Novelty and Difficulty of the Issues

Mover avers that there were difficult issues in this case because it was contentious. For the reasons set forth above, the Court does not disagree. However, Mover chose a method and process

---

[40] P-538.

11

of resolution that was inefficient, time consuming and poorly conceived. Rather than utilize the power of the Court to quickly conclude disputes, Mover filed detailed pleadings, requested emergency hearings, scheduled pretrial and status conferences and regular hearings that he neglected to pursue and continued for months or even a year, rather than seek a judicial determination. It was frustratingly obvious to the Court during this period that the Masseys were taking advantage of the situation, yet the Court stood by powerless to intervene because Trustee failed to pull the proverbial trigger on his multitude of filings. A lawyer of Mover's stature should have the experience to know when litigation is inefficient and costly and when it is the least expensive method for resolving conflict.

### Skill Required to Perform the Legal Services Properly

The Court finds that Mover had the requisite skills to perform the legal services properly.

### Preclusion of Other Employment

Mover admits that it was not precluded from other employment during the time it worked on this case.[41] However, Mover avers that professionals "devoted substantial time to this case" and were often "prevented from working on other matters." While the Court acknowledges the efforts of Mover in this case, the Court reiterates that Mover was not efficient in its efforts, which resulted in excessive time spent on this case. The Court also notes that even within its own court section, Mover appeared in several other cases during this time period.

---

[41] P-787, p. 19.

### Customary Fee

The hourly rates charged by Mover are customary in this community.

### Whether the Fee is Fixed or Contingent

Mover was allowed a $20,000.00 retainer. All of Mover's fees are subject to Court approval. The Court has already approved $269, 208.00. in fees, $20,000.00 of which were applied against the retainer. "The criterion for the court is not what the parties agreed but what is reasonable."[42]

### Time Limitations Imposed by the Client or Other Circumstances

Mover avers that there were time limitations due to the status of this case at the time of conversion from Chapter 11 to Chapter 7. Mover also avers that there were more time constraints due to the Masseys' uncooperativeness and the location and disposition of assets. The Court finds this unpersuasive.

### Amount Involved and Results Obtained

The total amount of fees requested by Mover for avoidance actions was approximately $131,885.75. The Court finds this reasonable in light of the $153,000 in cash recovered as a result plus the recovery of several expensive items which were later sold at auction.

---

[42] *Clark v. American Marine Corp.*, 320 F.Supp. 709, 711 (D.C.La. 1970).

The Court also finds reasonable the amount of fees requested in connection with the sale of estate assets. Mover requested a total of $40,351.50, while proceeds from the sale of assets were $258,917.50.

The fees requested for the "sustainability of Med Link" and "legal assistant" were both negligible and reasonable.

The total amount of fees requested by Mover in connection with Trustee's Objection to the Masseys' discharge was approximately $43,782.50, and in connection with "general administration of the estate" was approximately $41,950.00. While these fees are unusually large, the Court finds both of these amounts reasonable in light of the circumstances of this case. However, the Court does not find reasonable an additional fee of approximately $118,994.00 for "enforcement of [the Masseys'] obligations and compliance." The Court considered enforcement in approving fees for Objection to the Masseys' discharge and "general administration of the estate." While the Masseys were not always entirely cooperative, the Court does not find this case particularly undesirable and believes the fees awarded in connection with the Objection to Discharge and general administration were more than adequate compensation for Mover's efforts.

The Court has previously approved fees and costs of Mover. On December 30, 2007, the Court approved $11,858.75 in fees.[43] On December 17, 2009, the Court approved 258,216.75 in fees and $3,119.34 in costs.[44]

---

[43] P-529.

[44] P-771.

The total cash recovered by Mover is $424,917.50,[45] and the total amount of fees approved to date are $269, 208.00. Therefore, this Court has already approved fees to Mover of 63.36% of the total amount recovered. The Court feels the amount already approved is sufficient in light of the results obtained.

### Experience, Reputation and Ability of the Attorneys

The Court finds that the hourly rates charged by Mover are justified by the experience, reputation, and ability of its attorneys.

### Undesirability of the Case

Mover avers that this case is undesirable because of time limitations, the contingent nature of the fees, preclusion from other employment, and the difficulty of the issues. However, in *Johnson*, this factor focused on whether taking this case would have an economic impact on the firm. In *Johnson*, the Fifth Circuit found the case undesirable because attorneys who took discrimination cases were not "pleasantly received by the community or his contemporaries."[46] Mover has not demonstrated any such an effect on its practice.

### Nature and Length of the Professional Relationship with the Client

Mover has represented Trustee in one other matter. Mover does not allege that it varied its fee "in light of the professional relationship" of Trustee with its office.[47]

---

[45] The Court calculated the total cash recovered by the estate by adding the following: $50,000 (adv. 08-1117); $15,000 (adv. 08-1119); $7,000 (adv. 09-1007); $22,500 (adv. 09-1014); $25,000 (adv. 09-1027); $33,500 (adv. 09-1030; $13,000 (ring and earrings); $258,917.50 (sale of assets).

[46] *Johnson*, 488 F.2d at 719.

[47] *Id*.

15

**Award in Similar Cases**

Mover alleges that the fees requested are comparable to those awarded in similar cases. The Court disagrees. In private practice, an attorney will typically handle a matter such as this on either an hourly or contingent fee basis. If a contingency fee is utilized, counsel will receive 33 1/3% of all collections, an amount well below that awarded to date. While hourly fees don't have a legal cap, they carry a practical one. In theory an attorney could charge his client an hourly fee that consumes the entire recovery, but most are loath to do so because a client rarely appreciates legal services that result in no benefit to the client. Just as in private practice, Mover cannot expect compensation that exhausts all recoveries secured through his efforts.

In this case, the fees of general administration and to secure the Masseys' waiver of discharge amount to $85,732.50. These fees carry no particular benefit to creditors but they are valuable to the bankruptcy system. As a result, although they are large, they are allowed. In addition, the Court awards $3,962.50 in investigative fees surrounding Med Link and $4,442.50 for Mover's legal assistant, and $172,237.25 for the actual costs of recovery of assets and their liquidation. The total of these awards amount to 62.69% of the total recovery. To award Mover the additional fees requested would almost completely consume any benefit to claimants. As this Court has often warned counsel, the bankruptcy process is not designed to only support lawyers. Their efforts must result in some benefit to claimants.

**Conclusion**

For the reasons assigned above, the Third and Final Application for Allowance of Fees and Costs[48] filed by Gordon, Arata, McCollam, Duplantis & Eagan, LLC is denied. The Court will enter a separate Order in accord with this ruling.

New Orleans, Louisiana, February 22, 2011.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge

---

[48] P-787.